**In the Matter of the Grievance of Terry DEUTER, Grievant and Appellant,**

**v.**

**SOUTH DAKOTA HIGHWAY PATROL, Employer and Appellee.**

**No. 13565.**

Supreme Court of South Dakota.

Argued Feb. 23, 1982.

Decided March 2, 1983.

Max A. Gors of Maher, Gors & Dean, Pierre, for grievant and appellant.

Jeffrey P. Hallem, Asst. Atty. Gen., Pierre, for employer and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

HENDERSON, Justice.

## ACTION

Appellant Terry Deuter, a trooper for the South Dakota Highway Patrol (Highway Patrol), received a notice of discharge from appellee, the Highway Patrol. An appeal was made to the Law Enforcement Civil Service Commission (Commission), and the Commission decided to reinstate appellant as a trooper. The Highway Patrol appealed to the circuit court, and the circuit court reversed the Commission's decision. Appellant appeals from the circuit court's order. We reverse and remand.

## FACTS

After a meeting on January 9, 1980, appellant was notified on January 15, 1980, that he was discharged from the Highway

Patrol pursuant to SDCL 3–7–15.[1] The grounds for appellant's discharge were: a) violating Highway Patrol regulations (SDCL 3–7–15(5)); b) insubordination for failure to obey superior officers (SDCL 3–7–15(5)); and c) disgraceful conduct and insubordination (SDCL 3–7–15(10)). As a factual basis for appellant's discharge, the Highway Patrol alleged: a) on March 31, 1979, appellant allowed an armed 18-year-old individual to ride in his patrol vehicle. Appellant was reprimanded for this incident on May 30, 1979; b) on December 7, 1979, appellant allowed an armed civilian to accompany him in his patrol vehicle; c) on December 18, 1979, appellant threatened a juvenile with possible bodily harm; d) on January 9, 1980, appellant capriciously and recklessly placed a loaded pistol on Director Baum's desk; and e) appellant continually displayed poor judgment.

Subsequent to receiving notice of his discharge, appellant filed a notice with the Law Enforcement Civil Service Commission contending that his discharge was made without just cause. A three-day hearing was conducted by the Commission and approximately 36 witnesses testified. As a result, the Commission found that appellant's discharge was made without good or just cause and ordered him reinstated as a trooper. Findings of fact made by the Commission include the following: all of appellant's drug arrests resulted in convictions; appellant had three preventable accidents in his patrol vehicle; appellant has not had any more accidents since attending a special driving course; appellant had not displayed poor judgment; appellant responded to the efforts of his supervisors to counsel him; appellant met or exceeded the performance standards established by the Highway Patrol; the reprimand given to appellant was not clear; appellant did not improperly threaten a juvenile with bodily harm; appellant did not act carelessly or capriciously when he placed a firearm on Director Baum's desk; and appellant was effective and aggressive as a trooper and treated everyone equally and fairly.

The Highway Patrol appealed the Commission's decision to the circuit court. After reviewing the evidence and hearing oral arguments, the circuit court reversed the Commission, holding that the Commission's findings of fact and conclusions of law were clearly erroneous, arbitrary and capricious, or an abuse of discretion. Findings of fact and conclusions of law were not entered by the circuit court. Appellant has appealed to this Court.

## ISSUE

WERE THE FINDINGS OF FACT AND CONCLUSIONS OF LAW ENTERED BY THE LAW ENFORCEMENT CIVIL SERVICE COMMISSION CLEARLY ERRONEOUS AND ARBITRARY OR CAPRICIOUS OR CHARACTERIZED BY AN ABUSIVE AND CLEARLY UNWARRANTED EXERCISE OF DISCRETION? WE HOLD THAT THEY WERE NOT.

## DECISION

■ Appellant Deuter contends that the circuit court erred in reversing the Commission's ruling. Actions involving the Commission are governed by SDCL ch. 1–26, the "Administrative Procedures Act." *Drovdal v. State Dep't of Pub. Safety,* 255 N.W.2d 437 (S.D.1977). When we are called upon to review an administrative agency ruling such as the one at bar, we are guided by SDCL 1–26–35 and SDCL 1–26–36.[2] A rul-

---

1. This statute was repealed July 1, 1980.

2. SDCL 1–26–36 provides in pertinent part:
   The court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the ad-

ministrative findings, inferences, conclusions, or decisions are:
   (1) In violation of constitutional or statutory provisions;
   (2) In excess of the statutory authority of the agency;
   (3) Made upon unlawful procedure;
   (4) Affected by other error of law;
   (5) Clearly erroneous in light of the entire evidence in the record; or

ing or decision of an administrative agency is upheld unless we find that in light of the entire record, the decision is clearly erroneous or we are left with a firm and definite conviction that a mistake has been made. *Fraser v. Water Rights Comm'n, etc.,* 294 N.W.2d 784 (S.D.1980). Additionally, as we review the administrative record we are not bound by a presumption that the circuit court was correct. *Matter of Clay-Union Elec. Corp.,* 300 N.W.2d 58 (S.D.1980); *Matter of South Lincoln Rural Water Sys.,* 295 N.W.2d 743 (S.D.1980).

Appellee Highway Patrol contends that the Commission does not have the power to make an independent determination into whether the discharge of appellant Deuter was proper. According to the Highway Patrol, the Commission is, in essence, a limited appeals forum which is constrained to determine if evidence exists to support the Highway Patrol's decision. On the other hand, appellant Deuter asserts that the Commission proceeding was a de novo due process hearing.

█ Statutory authority for Commission jurisdiction over Highway Patrol disciplinary action is derived from SDCL 3–7–17.[3] In *Drovdal,* 255 N.W.2d at 439, we held: "The function of the Commission under SDCL 3–7–17 is merely to determine whether or not the removal, discharge, or reduction was made for good cause under the provisions of SDCL 3–7–15." However, in *Drovdal,* we addressed a situation where the Commission found that good cause existed for dismissal of a trooper, but then

reduced the level of disciplinary action taken by the Highway Patrol. Therefore, *Drovdal* stands for the proposition that the Commission does not have authority to modify the *type* of disciplinary action taken by the Highway Patrol. Rather, the function of the Commission is to conduct a hearing comporting with due process requirements to determine if good cause exists for the disciplinary action of the Highway Patrol. If good cause is not found, the Commission must order reinstatement of the employee with back payment of wages. SDCL 3–7–17, *supra.*

However, our decision in *Drovdal* should not be read to restrict the fact-finding duties and responsibilities of the Commission. *See Appeal of Miller,* 283 N.W.2d 241 (S.D.1979).

█ Procedurally, the Highway Patrol meeting held with Trooper Deuter on January 9, 1980, was not conducted in the posture of a due process hearing. Appellant was provided with only two days' notice prior to the January 9 meeting. Trooper Deuter was not given the right to produce or confront witnesses. We deem this inadequate to satisfy a due process hearing. Indeed, charges against appellant Deuter were not drawn up until after the January 9 meeting. Under the Fourteenth Amendment to the United States Constitution, an individual is entitled to due process of law before his life, liberty, or property is taken away by the government. *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam); *Morrissey v. Brewer,*

---

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

3. SDCL 3–7–17 provides:
Every employee who has been disciplined may file with the commission and the appointing authority a statement in writing, alleging that the disciplinary action was made without just cause. Upon the filing of the statement there shall be a hearing, the time and place fixed by the commission and notice given to the appointing officer and to the employee. At the hearing the commission shall determine and decide whether or not the disciplinary action was made for good cause. The chairman of the commission may administer oaths and secure

by the subpoena of the commission the attendance and testimony of witnesses and the production of evidence. If the commission shall find that the disciplinary action was made without just cause, it shall enter an order reinstating the employee to his former position and directing the payment of all back salary due. If the commission finds that the disciplinary action was made for good cause, it shall enter an order to that effect, and the action shall stand. Appeals to the circuit court for Hughes county may be taken pursuant to chapter 1–26. The appeal shall be taken by filing in the office of the commissioner a notice of appeal. The commission may develop rules, pursuant to chapter 1–26, concerning disciplinary action.

408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Fin. Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Holland v. Parker,* 332 F.Supp. 341 (D.S.D.1971), *rev'd,* 469 F.2d 1013 (8th Cir.1972).

■ When the Highway Patrol discharges an employee for reasons such as listed herein, that employee is entitled to a due process hearing to contest the allegations made against him and clear his reputation. *See generally,* Nowak, Rotunda, and Young, *Constitutional Law* at 488 (1978). Under SDCL 3–7–17, the Commission is a proper forum for the employee's due process hearing. Therefore, we are unwilling to restrict the role of the Commission in the manner prescribed by the Highway Patrol. The Commission proceeding held herein was appellant's initial due process hearing and, as such, the Commission acted de novo.

■ Reviewing the extensive transcript and tapes of the Commission's hearing, we find that Trooper Deuter's employment performance was well canvassed (three days of hearing, 36 witnesses, 28 exhibits) and the Commission's findings and conclusions are sufficiently supported. In particular, the Commission's determination that Trooper Deuter's reprimand was unclear was strongly supported. Lt. Ken Rand, one of Trooper Deuter's immediate superiors stated that the Highway Patrol manual and policies did not prohibit passengers from having firearms. Indeed, Lt. Rand stated that when he explained Trooper Deuter's reprimand to him, Trooper Deuter was only told not to have unauthorized riders. Lt. Rand admitted that he did not admonish Trooper Deuter to not allow authorized riders to carry firearms. Lt. Rand himself acknowledged that Trooper Deuter could have misunderstood his reprimand.

Director Baum admitted that the Highway Patrol policy cited in Trooper Deuter's reprimand did not prohibit passengers from carrying firearms. The Director also admitted that the reprimand did not state that Trooper Deuter's future authorized passengers could not carry firearms and

that Trooper Deuter could have misinterpreted the reprimand. Sgt. Printup, another immediate superior to Trooper Deuter stated that after the reprimand, Trooper Deuter was only instructed that he was not to have unauthorized passengers.

Richard Siedschlaw, a former ten-year veteran of the Highway Patrol testified that authorized and unauthorized armed civilians rode with him in his vehicle. Curt Hakl, a trooper from Elk Point, who formerly was assigned to Murdo, testified that on one occasion an armed civilian was allowed to ride in his vehicle. James Pelle, a trooper assigned to Murdo, testified that on one occasion he allowed an unauthorized civilian to ride with him and that his sergeant had led him to believe that it was the trooper's decision to inform a passenger that a firearm was available in the vehicle for their use and protection.

After Trooper Deuter's reprimand, two passengers were authorized to ride with him by Sgt. Printup and Lt. Rand, and both passengers executed waivers of liability. We are unconvinced that Trooper Deuter would have allowed his authorized passengers to have firearms had he clearly known that the Highway Patrol did not wish them to have firearms.

The dissent of Justice Wollman and the circuit court's characterization of the facts pertaining to Trooper Deuter's placing the pistol on the table at a meeting is unfair and unsupported by the record. Director Baum's testimony is as follows:

> At that point, he had told me about his drug activity from the standpoint that he had been involved in the enforcement in drug activity and that he had, you know, some dangers there, and to show me the danger that he had, he pulled out a weapon and said that he, you know, had taken this off an individual as a result of a drug arrest and wanted me to be aware of the type of thing that he was confronted with out there on the highway, and he didn't throw the weapon but he, you know, slipped the weapon onto my desk, and the Lieutenant got up, checked the weapon.

It was fully loaded with one in the chamber and off safe, and I guess that I let him continue telling his story and asked him a few more questions, and then I proceeded to tell him that based on all the allegations that had been made in the past, I questioned his judgment and his common sense.

Later, Director Baum reaffirmed his testimony. Defense counsel: "Did he actually— you said he didn't actually throw it onto the table?" Director Baum: "No. He would have been—just like that, I mean (indicating)." Defense counsel: "So he laid it down?" Director Baum: "He didn't gingerly lay it on the desk. It was placed on the desk, but, I mean, it was still in such a manner that it was repulsive to me." Furthermore, an experienced law enforcement officer of fifteen years, who was also a gunsmith, testified as an expert on the safety features of the Colt .380 semi-automatic pistol in question. The pith of his testimony was that the weapon had a slide safety and a grip safety which prevented accidental discharge and his exact testimony was: "I could see no conceivable manner in which it could have gone off." He emphasized that both the grip safety and the trigger had to be depressed simultaneously for the weapon to be discharged.

We are unpersuaded by the circuit court and the Highway Patrol's assertion that the Commission's findings of fact and conclusions of law were clearly erroneous and arbitrary or capricious or characterized by an abusive and clearly unwarranted exercise of discretion. Therefore, we reverse the holding of the circuit court and remand this case with instructions to reinstate appellant as an active trooper of the South Dakota Highway Patrol.

Reversed and remanded.

DUNN and MORGAN, JJ., concur.

FOSHEIM, C.J., and WOLLMAN, J., dissent.

WOLLMAN, Justice, dissenting.

I agree with the circuit court that the May 30, 1979, letter of reprimand and Deuter's subsequent violation of Patrol policy as outlined in that letter constituted good cause for discharge under SDCL 3–7–15(5).

I am also of the opinion that the Commission's treatment of the pistol incident that occurred at the January 9, 1980, hearing in Director Baum's office fatally infects its findings and conclusions. I turn to Judge Miller's memorandum opinion for a description and analysis of that incident:

The record also supports the Patrol's determination that Deuter exercised poor judgment in stress situations. On January 9, 1980, Deuter attended a meeting concerning certain deficiencies in his performance record. Present at the meeting were Deuter, his immediate supervisors and the Director of the Patrol. During the meeting, Deuter pulled a semi-automatic pistol from his coat and threw it onto the Director's desk, knowing that the gun was fully loaded with one bullet in the chamber. Additionally, the safety mechanism on the side of the pistol was in the off position.

The Commission, in its findings of fact, determined that Deuter did *not* display a capricious and reckless disregard for the life and safety of others by his actions. This finding, however, is clearly erroneous, SDCL 1–26–35(5), and is not supported by substantial evidence in the record. *City of Brookings v. Dept. of Environmental Protection*, 274 N.W.2d 887, 890 (S.D.1979). Every witness who testified about the incident before the Commission, including Deuter and his own witnesses, stated that Deuter exercised poor judgment by throwing the fully loaded pistol onto the Director's desk. Further, it would defy logic and common sense to hold that such action was not a capricious and reckless disregard for the life and safety of others. The Director of the Patrol testified that Deuter's conduct also violated the Patrol's regulations regarding the careless and reckless use of firearms. Thus, the Patrol again had just cause to discharge Appellee under SDCL 3–7–15(5), supra.

The majority opinion labels as unfair and unsupported the circuit court's characterization (in which I join) of the facts pertaining to the manner in which Deuter placed the pistol on Director Baum's desk. In support of this charge, the majority opinion cites a portion of Director Baum's deposition testimony. I am content to rely upon the typed transcript of the hearing, as supplemented by the tape recordings thereof, as support for the trial court's description of the gun incident. Lieutenant Rand testified as follows:

Q. Now, could you show us how the pistol was placed on the Director's desk?

A. Yes. He withdrew it from his jacket pocket on the back of his chair. He took it out of the pocket and made some statement to the effect that this was in the condition that he had found it in a pickup and basically placed it on the desk in that manner. (Indicating) [And here there is a clearly audible sound in the tape recording of the gun hitting the witness table.]

Q. Where did it end up pointing?

A. At me.

Q. What did you do then?

A. After a short time, I sat there looking down the barrel of the gun, and it made me a little concerned, and I got up and—to check the weapon to see if it was loaded or empty or whatever. I dropped the clip out of it, found the clip to be loaded with six rounds. I pulled back the slide and there was a round in the chamber.

Q. Did this indicate that the safety was off?

A. Yes.

Q. And why would that be?

A. Because if the safety's on, you have to release the safety before the slide can be pulled to the back.

Likewise, during direct examination Captain Kinney testified, "And at this point, Terry had it in his hand, and he walked over and threw it onto the desk." During cross examination, Captain Kinney demonstrated the manner in which Deuter placed the weapon on Director Baum's desk: "The gun was in the pocket of his jacket, that he pulled the gun out of the pocket and he—like that." (Indicating) [And here again there is a clearly audible sound on the tape recording of the gun hitting the witness table.]

During his testimony on direct examination, Director Baum described the gun incident in the following words:

A. He got up out of his chair and took a weapon out of his coat pocket and came over and threw it on my desk.

Q. Did he say anything while he was doing this?

A. He said something to the effect that this is the kind of thing that we have to deal with down there and that's fully loaded and one in the chamber, just the way I got it.

. . . . .

Q. Now, could you show us exactly how the weapon was placed on your desk?

A. He just got up and leaned over and went like that across my desk. (Indicating) [And here there is a clearly audible sound on the tape recording of the weapon hitting the witness table.]

Indeed, during this cross examination of one of the other officers who was present during the gun incident, Deuter's counsel asked, "So, really, the only thing that deals with the gun now is the fact that he tossed her [sic] up on the table where it might go off?"

In view of the foregoing testimony and the audible record of the reenactments, I conclude that the trial court was perfectly justified in using the same characterization of the gun incident as that used by the witnesses who were present—indeed, by Deuter's own counsel. To restrict oneself to the word "place" in describing the method in which the weapon came to rest on Director Baum's desk is to leave the inference that Deuter handled the weapon with

the care that one would bestow upon a Ming vase, an inference that is totally unsupported by the record.

I agree fully with the trial court that it defies logic and common sense to view Deuter's conduct with respect to the gun incident as not constituting a capricious and reckless disregard for the life and safety of others. Indeed, Deuter's own testimony gives lie to the Commission's finding on this point:

A. [I] thought that both safeties were on.

Q. Well, even if both safeties were on, were you a hundred percent sure that that gun wouldn't go off?

A. Is anybody a hundred percent sure that a gun will never go off?

Q. [Y]ou knew there was some chance you were endangering everybody's life in that office by what you were doing; is that right?

A. A slight chance.

Q. But you thought it was worth it to prove your point?

A. Yes.

It is easy in the safety of appellate chambers to look with equanimity upon Deuter's temerariousness in throwing the loaded weapon onto Director Baum's desk. Those who were present at the time, especially Lieutenant Rand, in whose direction the barrel was pointing when the gun came to rest, may be forgiven for not sharing that equanimity. Would any of us long suffer a child of ours to handle a firearm, loaded or unloaded, thus in our presence? A rhetorical question, perhaps, but nonetheless one that should give us pause in weighing the significance of Deuter's conduct.

In *State v. Heumiller,* 317 N.W.2d 126 (S.D.1982), we held that the crime of aggravated assault can be committed by the use of an unloaded weapon. How ironic that one can casually toss a loaded pistol onto a desk in a room filled with people and not be characterized as having acted in wanton disregard of the life and safety of others.

Condonation of such behavior and disregard of the possible danger resulting from the lack of judgment and self-control that gave rise to the behavior exalts civil service protection to an art form.*

Not only was the Commission's finding on the firearm incident clearly erroneous, it missed the essence of the significance of the incident—that it represented a palpable manifestation of immature, unstable behavior and constituted the culmination of a series of incidents that caused Director Baum to conclude that for the good of the highway patrol and the safety of the public he had no choice but to discharge Deuter.

That Director Baum was deeply concerned about his responsibilities to his fellow officers and to the public is summarized by his testimony:

My major concern in looking at the case is that when I took the job as Director of the Highway Patrol, I feel that I have responsibility to the members in that organization, to the organization as a whole, and to the citizens of this state. As far as I was concerned, allowing this type of activity to continue or to have the possibility that something of more serious nature might happen would make a direct reflection on the organization, and I had a responsibility again to the people from that standpoint of seeing to it that not one of those persons were harmed or that a fellow officer was not harmed because I didn't have full control of his actions in a stressful situation.

Not only was Director Baum rightfully concerned about the possible harm to the members of the public, he had the right to be concerned about the danger of liability on the part of the state for any harm that might result from Deuter's lack of judgment, whether with firearms or otherwise, in the course of his duties. See, e.g., *Bonsignore v. City of New York,* 683 F.2d 635 (2d Cir.1982), in which the City of New York was held liable for the injuries suffered by the wife of an officer who shot her

---

* For a fascinating, if discouraging, account of what has happened in the federal civil service, see Reed, *Bureaucrats 2, Presidents O,* Harper's, November 1982, at 18.

with his off-duty revolver, liability being based on the following rationale:

> In this case both the type of harm that occurred and the person on whom the injury was inflicted were foreseeable. The City could reasonably have anticipated that its negligence in failing to identify officers who were unfit to carry guns would result in an unfit officer injuring someone using the gun he was required to carry.

683 F.2d at 638. See also *Morgan v. District of Columbia,* 449 A.2d 1102 (1982). Cf. *Kruger v. Wilson,* 325 N.W.2d 851 (S.D. 1982), and *National Bank of South Dakota v. Leir,* 325 N.W.2d 845 (S.D.1982).

The Commission's decision, and the judicial endorsement thereof, reduces the Director of the Highway Patrol to a deferential minion, forced to seek permission from the Commission to impose condign discipline upon an errant trooper. The South Dakota Highway Patrol is necessarily imbued with some of the attributes of a military organization, the hallmark of which is the need for command discipline and staff responsibility. If we hedge about the Director's authority with such a dike of due process and civilian review that he is reduced to a functionary, the public may well pay the price in terms of an organization that lacks that internal discipline that is necessary to maintain the esprit de corps that should be the badge of those to whom we have, in the largest sense of the word, entrusted our safety by virtue of their duty to enforce the laws of this state.

Protection against arbitrary, capricious, vindictive, pretextual retaliatory discipline and termination is a laudable goal. Frustration of the exercise of legitimate command authority and discretion necessary to maintain a tightly run, highly disciplined corps of peace officers is quite another thing.

What we said in *Appeal of Miller,* 283 N.W.2d 241, 243 (S.D.1979), is applicable here:

> The Board should not lightly interfere with managerial decisions made by those charged with the responsibility of insur-

ing that the employees of the Department who are entrusted with this authority and responsibility perform their duties with that degree of professional skill and competence that their respective positions require and that the citizens of this state are entitled to expect. We cannot believe that the Legislature intended that the Career Services Act be interpreted and administered in a manner that would have the effect of immunizing employees covered by the provisions of the Act from good faith managerial decisions, based upon good cause, designed to promote the efficient operation of the executive branch of state government.

None of what I have written is intended to denigrate Deuter as an individual. The record reveals that he was zealous and aggressive, perhaps to a fault. Sadly, he lacks the one personal component that is essential in an armed officer—that elusive yet tangible quality which cannot really be taught or learned—good judgment. Trooper Deuter's problem was well summarized by Director Baum in his testimony regarding the field training officer's reports:

> [A]nd the final analysis, I guess, of the overall report indicated to me through the reports that Terry had problems in making some judgment calls. One of them was in reference to while he was returning home in his personal vehicle, that he was making stops of violators, and these circumstances indicated that he had a problem with making judgment calls and that his situation should be closely monitored and that if he kept it under control, he would make an exceptional officer. If he didn't, that he would bust out completely.

Unfortunately, Director Baum's concern that Deuter might "bust out completely" was proved well-founded by the gun incident. Director Baum had a difficult choice to make. His decision that for the good of the Highway Patrol and the citizens of this state Trooper Deuter be relieved of his duties was a command decision that finds support in the evidence and which should not have been overturned by the Commission nor by this Court.

I would affirm the decision of the trial court.

I am hereby authorized to state that Chief Justice FOSHEIM joins in this dissent.